# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2012AP122 |
| COMPLETE TITLE: | Anthony Gagliano & Co., Inc., <br>      Plaintiff-Appellant, <br>    v. <br> Openfirst, LLC and New Electronic Printing Systems, LLC, <br>      Defendants-Respondents, <br> RWK Enterprises, Inc., d/b/a Alphagraphics, Inc., OFH <br> Distribution, LLC , f/k/a Openfirst Holdings and New <br> Diversified Mailing Services, LLC, <br>      Defendants, <br> Quad Graphics, Inc. and Robert Kraft, <br>      Defendants-Respondents-Petitioners. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
346 Wis. 2d 47, 828 N.W.2d 268
(Ct. App. 2013 – Published)
PDC No: 2013 WI App 19

| | |
|---|---|
| OPINION FILED: | July 15, 2014 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | December 18, 2013 |

| | | |
|---|---|---|
| SOURCE OF APPEAL: | | |
| | COURT: | Circuit |
| | COUNTY: | Milwaukee |
| | JUDGE: | Dennis P. Moroney |

| | |
|---|---|
| JUSTICES: | |
|   CONCUR/DISSENT: | BRADLEY, J., concurs in part, dissents in part. (Opinion filed.) |
|   DISSENTED: | ABRAHAMSON, C.J., dissents. (Opinion filed.) |
|   NOT PARTICIPATING: | |

ATTORNEYS:

    For the defendant-respondent-petitioner Quad Graphics, there were briefs by *Michael B. Apfeld*, *Michael D. Huitink*, and *Godfrey & Kahn, S.C.*, Milwaukee, and oral argument by *Michael B. Apfeld*.

For the defendant-respondent-petitioner Robert Kraft, there were briefs by *Ann M. Maher*, *Lisa M. Lawless*, and *Whyte Hirschboeck Dudek S.C.*, Milwaukee, and oral argument by *Lisa M. Lawless*.

For the plaintiff-appellant, there were briefs by *Thomas Armstrong*, *Beth J. Kushner*, and *Von Briesen & Roper, S.C.*, Milwaukee, and oral argument by *Thomas Armstrong*.

An amicus curiae brief was filed by *Thomas D. Larson*, Madison, on behalf of the Wisconsin Realtors Association.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2012AP122
(L.C. No. 2008CV17601)

STATE OF WISCONSIN      :      IN SUPREME COURT

**Anthony Gagliano & Co., Inc.,**

      **Plaintiff-Appellant,**

    v.

**Openfirst, LLC and New Electronic Printing Systems, LLC,**

      **Defendants-Respondents,**

**RWK Enterprises, Inc., d/b/a Alphagraphics, Inc., OFH Distribution, LLC , f/k/a Openfirst Holdings and New Diversified Mailing Services, LLC,**

      **Defendants,**

**Quad Graphics, Inc. and Robert Kraft,**

      **Defendants-Respondents-Petitioners.**

**FILED**

**JUL 15, 2014**

Diane M. Fremgen
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Affirmed in part, reversed in part, and remanded.*

¶1 PATIENCE DRAKE ROGGENSACK, J. We review a decision of the court of appeals[1] reversing the circuit court's order[2] dismissing plaintiff Anthony Gagliano & Co., Inc.'s (Gagliano) claims against defendants New Electronic Printing Systems, LLC; Openfirst, LLC; Robert Kraft; and Quad/Graphics, Inc. Gagliano's claims concern rent allegedly owed under several commercial leases. This case presents two issues for our review: (1) whether Gagliano gave sufficient notice to extend the leases to the time when the alleged breach occurred; and (2) whether Quad/Graphics was a subtenant of the lessee or an assignee of the leases.

¶2 As to the first issue, we conclude that Gagliano's notice was valid. Gagliano provided notice: (1) to the entity designated as the tenant on the original lease; (2) to the entity who was the current tenant at the time of the notice; and (3) to the entity a subsequent amendment of the lease designated as the tenant. The notice is also valid because the current tenant at the time Gagliano sent the notice had actual notice that Gagliano was exercising its alleged right to extend the leases. Accordingly, we affirm the portion of the decision of the court of appeals that reversed the circuit court's directed verdict, which had concluded that Gagliano's notice was not valid. We remand to the circuit court for fact-finding

---

[1] Anthony Gagliano & Co. v. Openfirst, LLC, 2013 WI App 19, 346 Wis. 2d 47, 828 N.W.2d 268.

[2] The Honorable Dennis P. Moroney of Milwaukee County presided.

necessary to decide the merits of Kraft's remaining arguments relating to the lawfulness of the extension provision in the leases.

¶3 In regard to the second issue, we conclude that Quad/Graphics is not liable to Gagliano because Quad/Graphics was a subtenant of the lessee, not an assignee of the leases. Undisputed evidence shows that New Electronic Printing Systems, the assignee of the original tenants, did not transfer its entire remaining leasehold estate to Quad/Graphics. Because Gagliano and Quad/Graphics did not share privity of estate, it is not an assignee. Therefore, we do not hold Quad/Graphics liable for New Electronic Printing Systems' alleged breach of contract to which Quad/Graphics was not a party. Accordingly, we reverse the portion of the decision of the court of appeals that reversed the order of the circuit court granting summary judgment in favor of Quad/Graphics and remand to the circuit court for dismissal of all claims against Quad/Graphics.[3]

## I. BACKGROUND

¶4 In 1996, Robert Kraft formed Electronic Printing Systems, Inc.,[4] a data processing company that helped businesses

---

[3] On a motion for summary judgment, the circuit court found Quad/Graphics was "not an alter ego under the circumstances of this case." While Gagliano argued for reversal of that determination to the court of appeals, it makes no such argument in this review. We therefore deem that argument abandoned, requiring no further consideration. See Gister v. Am. Family Mut. Ins. Co., 2012 WI 86, ¶37 n.19, 342 Wis. 2d 496, 818 N.W.2d 880.

[4] This is a different corporate entity from New Electronic Printing Systems, LLC, which is a party to this action.

with their billing operations. Over the course of about 12 years, that company was rebranded, restructured, and sold to various entities. It also changed locations within Milwaukee's third ward from its original facility on Buffalo Street to Gagliano's facility at 300 North Jefferson Street, where it remained until it went out of business.

¶5 This case involves several leases that the company and its progenies had with Gagliano. It requires us to determine whether Gagliano provided valid notice to extend those leases to the time of the alleged breach. It also requires us to determine whether Quad/Graphics, the last entity to acquire assets of what was Electronic Printing Systems, can be held liable for that alleged breach. Before reaching these issues, we review the leases and describe the various changes the company underwent that bear on our decision.

A. The Leases

¶6 There are two North Jefferson Street leases that underlie this action: the May 22, 2000 lease and the May 18, 2001 lease. Both leases were amended numerous times as will be explained below.

¶7 On April 11, 2000, Gagliano and Kraft entered into a lease for 50,000 square feet of property in the Jefferson Street facility for a term of five years. The lease initially gave the tenant, which the lease listed as "Electronic Printing Systems," the right to extend the lease for "two consecutive additional periods of three years." The record shows that this section was crossed out.

4

¶8   On May 22, 2000, Gagliano and Kraft executed a revised version of the lease, which superseded the April 11, 2000 version.  Whereas the first lease covered only 50,000 square feet of property, the May 22, 2000 lease covered 90,000 square feet, divided into two leased premises.  The portion of the lease for the initial 50,000 square feet expired June 23, 2006.  The portion of the lease for an additional 40,000 square feet expired six years after the tenant took occupancy.[5]

¶9   The May 22, 2000 lease contained several terms that bear on our analysis.  First, it provided that upon notice at least 120 days before the expiration of the initial term, Gagliano had the right to extend the lease for an additional four-year term.  Kraft claims that Gagliano fraudulently inserted this extension right for the landlord in place of the tenant's right to extend that was set out in the April 11, 2000 lease.  Second, the May 22, 2000 lease provided that Gagliano was to send notices to Electronic Printing System's Buffalo Street address prior to commencement of the lease and to the Jefferson Street facility thereafter.  Third, Kraft personally guaranteed the May 22, 2000 lease and was, along with Electronic Printing Systems, to remain liable in the event of any sublease or assignment, both of which required Gagliano's consent.

¶10  About a year after executing the May 22, 2000 lease, Kraft decided to lease additional space in the Jefferson Street

---

[5] The leases referred to the leased spaces as "Demised Premises I" and "Demised Premises II," respectively.  We will refer to them as the first and second leased premises.

5

facility for his son's printing business. On May 18, 2001, Gagliano and Kraft, this time on behalf of Openfirst, Inc., executed a new lease for an additional 1,848 square feet in the Jefferson Street facility that expired 16 months after the completion of certain work. This was a new lease (the 2001 lease) and not an amendment of the May 22, 2000 lease. Gagliano concedes that Kraft did not guarantee the 2001 lease. The 2001 lease did not provide for any extensions of the lease term by Gagliano.

¶11 Gagliano and Kraft amended the 2001 lease twice to extend its term, first to November 7, 2004 and then to June 23, 2006. The second amendment added a provision that permitted Gagliano to extend the lease for an additional four-year term by giving notice within 120 days of the lease's expiration.

¶12 Gagliano and Kraft also amended the May 22, 2000 lease in a document that lacks a date of execution, but states that it "commences" October 23, 2003. This amendment added 8,900 square feet of space in a third leased premises and designated "OpenFirst, Inc., successor in interest to Electronic Printing Systems" as the appropriate recipient for further notice.

¶13 On November 6, 2002, Openfirst, Inc. and related companies sold their assets to Openfirst Holdings, LLC; New Diversified Mailing Services, LLC; and New Electronic Printing Systems. As part of the asset purchase, the leases that underlie this action were assigned to the buyers. Gagliano consented to the assignment on the condition that the "Tenant and any and all guarantors of [the] Lease[s] . . . remain fully

6

liable under [the] Lease[s]." Gagliano also consented to New Electronic Printing System's subsequent assignment of the leases as collateral to Associated Bank, NA, again on the condition "that none of the original obligors and/or guarantors" be released from liability.

¶14 On December 29, 2005, Gagliano sent notice of its intention to extend both leases for an additional four-year term. He sent the notices to the persons, entities, and addresses that follow:

    Robert Kraft
    300 N. Jefferson St.
    Milwaukee, WI 53202

    Electronic Printing Systems, Inc.
    300 N. Jefferson St.
    Milwaukee, WI 53202

    Open First, Inc.
    300 N. Jefferson St.
    Milwaukee, WI 53202

    Target Marketing Solutions, Inc.
    300 N. Jefferson St.
    Milwaukee, WI 53202

¶15 Kraft received Gagliano's notice and informed Gagliano that he did not "recognize" the extension as valid. New Electronic Printing Systems remained in the facility and continued to pay rent into the extended period.

¶16 At the time Kraft received Gagliano's notice, he had begun negotiations with Quad/Graphics to restructure the businesses. As part of the restructuring agreement "Quad/Graphics loaned money to, and received a promissory note from the following entities so they could buy Quad/Graphics's

7

interest in the business: Openfirst [Holdings], LLC; New Diversified Mailing Services, LLC.; and New Electronic Printing Systems, LLC." Anthony Gagliano & Co. v. Openfirst, LLC, 2013 WI App 19, ¶17, 346 Wis. 2d 47, 828 N.W.2d 268 (internal quotation marks omitted). At the end of this transaction, New Electronic Printing Systems still owned the leases. Kraft remained a minority shareholder and officer until September 2007, when Quad/Graphics terminated his employment.

¶17 The restructuring with Quad/Graphics did not spell success for the companies involved. About two years later, New Electronic Printing Systems went out of business. Vice President and General Counsel of Quad/Graphics Andrew Schiesl explained the arrangement that followed:

> [New Electronic Printing Systems] was going out of business, [and] it owed QuadGraphics money as a borrower because QuadGraphics was a lender to it. As part of the ultimate resolution of that loan . . . the remaining business[, New Electronic Printing Systems, Inc.,] was effectively surrendered to QuadGraphics to pay back, to try and pay back the loan. QuadGraphics then started effectively sub-contracting or doing the business that it had just taken over at that point, and it needed to enter into a sublease with the sublessor so they could continue to use that space.

¶18 On June 23, 2008, to accomplish this arrangement, New Electronic Printing Systems and Quad/Graphics entered into two contracts. The first was the Voluntary Surrender Agreement and the second was the Sublease for certain space at the North Jefferson Street facility.

¶19 In the Voluntary Surrender Agreement, New Electronic Printing Systems agreed to surrender collateral to

8

Quad/Graphics, and Quad/Graphics could, "in its sole discretion, accept" the collateral or "any portion thereof." New Electronic Printing Systems did not tender, and Quad/Graphics did not accept, surrender of the leases. In this regard, the Voluntary Surrender Agreement stated, "For the avoidance of doubt, the Collateral shall not include any lease for real property."

¶20 The Voluntary Surrender Agreement permitted Quad/Graphics to "store the Collateral at [the North Jefferson Street facility] at no charge to Quad until all of [New Electronic Printing Systems, LLC's] obligations to Quad are satisfied in full or until disposition of the Collateral, whichever occurs earliest." Quad/Graphics and New Electronic Printing Systems set forth the terms of the storage arrangement in the Sublease, which expired October 31, 2008, unless terminated sooner by either party.[6] Gagliano did not sign a written agreement consenting to the sublease.

¶21 Quad/Graphics' communication with Gagliano began when, on September 1, 2008, Schiesl wrote to Gagliano informing Gagliano that New Electronic Printing Systems intended to vacate

---

[6] The copy of the Sublease in the record does not bear a signature on behalf of Quad/Graphics, but the parties do not dispute that Quad/Graphics did sign the Sublease. On December 6, 2013, Quad/Graphics moved to correct the appellate record and substitute a complete copy of the document that includes a signature page bearing the signature of Andrew Schiesl on behalf of Quad/Graphics. Gagliano opposed this motion. We reserved ruling on the motion until after oral argument, and now deny it. There is no dispute that Quad/Graphics did sign; therefore, the signed copy is not necessary to our decision.

and surrender the Jefferson Street facility on October 31, 2008. When Gagliano did not receive rent allegedly owed after that date, Gagliano's attorneys notified Kraft, Electronic Printing Systems, New Electronic Printing Systems, and Openfirst, Inc., that they were in default of the leases. This suit followed.

B. Procedural History

¶22 On June 4, 2009, Gagliano brought breach of contract claims against New Electronic Printing Systems, Quad/Graphics, and Kraft.[7] Gagliano claimed that its December 29, 2005 Notice of Landlord's Extension of Leases extended the terms of the May 22, 2000 lease for the first and third leased premises, as well as the 2001 lease for 1,848 square feet of space in the same building, to June 23, 2010. Gagliano also claimed that the notice extended the lease for the second leased premises to January 23, 2012.

¶23 Gagliano argued that New Electronic Printing Systems, as an assignee of the primary lease, was liable for prematurely vacating the premises, and Kraft was liable as a guarantor. As to Quad/Graphics, Gagliano claimed that Quad/Graphics had taken an assignment of the leases when it purchased New Electronic Printing Systems' assets in 2006 and therefore, was liable for the extended terms of the leases as well.

¶24 Quad/Graphics moved for summary judgment, arguing that there was no evidence that Quad/Graphics had taken a written

---

[7] Gagliano also brought claims against several other entities that did not participate in this review.

10

assignment of the leases, which the statute of frauds required, and that the doctrines of waiver and estoppel barred Gagliano's claims. The circuit court granted Quad/Graphics' motion, finding that "there is absolutely no indication that Quad agreed to any" assignment, and that it was Gagliano's obligation to find out "who the heck they're really doing business with" and negotiate for additional security from that party if it so desired.

¶25 Gagliano's remaining claims proceeded to trial. At the close of evidence, Kraft moved for a directed verdict on the grounds that Gagliano's notice of extension was invalid because Gagliano did not address the notice to New Electronic Printing Systems, the tenant at the time notice was given. The circuit court granted the motion, concluding that "there is a strict requirement of notice," under which Gagliano needed to serve Kraft in his capacity as a representative of New Electronic Printing Systems. In other words, Gagliano needed to address the notice to "New Electronic Printing Systems, c/o Robert Kraft," rather than simply to Kraft at New Electronic Printing Systems' address. Since the circuit court concluded that the notice of extension was invalid, it dismissed Gagliano's claim against Kraft and the other defendants.

¶26 Gagliano appealed, arguing that the circuit court erred when it granted Quad/Graphics' motion for summary judgment and when it directed a verdict on the notice of extension issue.

11

The court of appeals reversed both orders.[8] Regarding the directed verdict, it concluded the notice of extension was valid because "service was made on the correct entity"; "Open First, Inc., received the benefits of the May 18, 2001, lease"; and none "of the other documents changed that." Gagliano, 346 Wis. 2d 47, ¶31.

¶27 As to the circuit court's grant of summary judgment, the court of appeals concluded that Quad/Graphics was liable for rent for the remainder of the term of the extended leases because "Gagliano's consent to the assignment of the leases [to Associated Bank] when New Electronic Printing Systems took over the Openfirst business was conditioned on" any subsequent third party to whom New Electronic Printing Systems transferred its interest assuming "the obligations under and pursuant to the Leases." Id., ¶35. It further reasoned that Quad/Graphics was liable because it "accepted the benefits conferred by the Gagliano leases and their amendments" and the Sublease between New Electronic Printing Systems and Quad/Graphics was not

---

[8] The court of appeals stated that the appeal asked it "to review the trial court's grant of summary judgment to Quad/Graphics dismissing Gagliano's claims against it, and the trial court's grant of a directed verdict dismissing Gagliano's claims against New Electronic Printing Systems, LLC, and Openfirst, LLC." Gagliano, 346 Wis. 2d 47, ¶27. The court did not relate that Kraft joined the motion for a directed verdict and participated in the appeal. The court did, however, write that it was not going to "separately address" Gagliano's claims against Kraft, which we take as an acknowledgment that the portion of its decision reversing the directed verdict bound Kraft, as well as the other defendants. Id., ¶1 n.1.

12

binding on Gagliano because Gagliano was not a party to it. Id., ¶36.

¶28 Quad/Graphics petitioned this court for review of the following issue: "May a landlord recover from its tenant's subtenant (or more remote subtenants) all future rent that the immediate tenant had promised to pay, regardless of the terms of the transfer from tenant to subtenant or the amount of time that the subtenant occupies the premises?"

¶29 Kraft opposed Quad/Graphic's petition, but in the event that review was granted, cross-petitioned this court to review the following issues: (1) whether the court of appeals properly determined claims involving Kraft; (2) whether the court of appeals correctly reversed the circuit court's directed verdict; and (3) whether the court of appeals erred in regard to the fraud issue Kraft raised. We granted both petitions.

## II. DISCUSSION

### A. Standard of Review

¶30 This case requires us to review both a directed verdict and an order granting summary judgment. When an appellate court reviews the evidentiary basis for a circuit court's decision to grant a directed verdict, the verdict must stand unless the record reveals that the circuit court was clearly wrong. Weiss v. United Fire & Cas. Co., 197 Wis. 2d 365, 389, 541 N.W.2d 753 (1995) (quoting Helmbrecht v. St. Paul Ins. Co., 122 Wis. 2d 94, 110, 362 N.W.2d 118 (1985)) ("An appellate court should not overturn a circuit court's decision to dismiss for insufficient evidence unless the record reveals

13

that the circuit court was 'clearly wrong.'"). A circuit court's evidentiary determination is clearly wrong when there is any credible evidence to support the position of the non-moving party. See Marquez v. Mercedes-Benz USA, LLC, 2012 WI 57, ¶49, 341 Wis. 2d 119, 815 N.W.2d 314.

¶31 Our review of the circuit court's directed verdict does not turn on the sufficiency of the evidence. Rather, it involves the application of undisputed facts to principles of law. Specifically, we focus on whether a landlord's contractual notice to a tenant is sufficient when an appropriate person receives that notice at the appropriate address, but the notice does not indicate in what capacity the recipient of the notice is being addressed.

¶32 Although review of a directed verdict ordinarily focuses on the sufficiency of the evidence, we see no reason that a directed verdict based on a legal error, rather than an evidentiary problem, should escape review. We base this conclusion on our previous observation that summary judgment, similar to our determination in the present case, "is a legal conclusion by the court," and can rest on the "same [legal] theory" as a directed verdict. Steven V. v. Kelley H., 2004 WI 47, ¶35, 271 Wis. 2d 1, 678 N.W.2d 856; Lambrecht v. Estate of Kaczmarczyk, 2001 WI 25, ¶40 n.23, 241 Wis. 2d 804, 623 N.W.2d 751 (citing 10A Charles A. Wright et al., Federal Practice and Procedure: Civil § 2713.1, at 242-43 (1998); Daniel P. Collins, Note, Summary Judgment and Circumstantial Evidence, 40 Stan. L. Rev. 491, 491 (1988)). Both are appropriate when the moving

14

party is entitled to judgment as a matter of law because there is no genuine issue, in the case of summary judgment, or credible evidence, in the case of a directed verdict, to support the position of the nonmoving party. Wis. Stat. § 802.08(2) (2011-12);[9] Wis. Stat. § 805.14(1). Furthermore, we have previously construed decisions of a circuit court to conform with the analysis required to correct an error. Bubb v. Brusky, 2009 WI 91, ¶30, 321 Wis. 2d 1, 768 N.W.2d 903 (construing a circuit court's dismissal of a claim as if a motion for directed verdict had been made). As such, we review the legal basis for the circuit court's directed verdict independently. Tufail v. Midwest Hospitality, LLC, 2013 WI 62, ¶22, 348 Wis. 2d 631, 833 N.W.2d 586 (the interpretation of a lease, a written contract, presents a question of law for our independent review).

¶33 This case also requires us to review the circuit court's grant of summary judgment in favor of Quad/Graphics. "We review a grant of summary judgment independently, applying the same methodology as the circuit court" and the court of appeals, but benefitting from their prior discussions. City of Janesville v. CC Midwest, Inc., 2007 WI 93, ¶13, 302 Wis. 2d 599, 734 N.W.2d 428. In order to determine whether summary judgment was appropriate in this case, we must review various leases among the parties, which again presents a question of law for our independent review. Tufail, 348 Wis. 2d 631, ¶22.

---

[9] All subsequent references to the Wisconsin Statutes are to the 2011-12 version unless otherwise indicated.

## B. Directed Verdict

¶34 We begin with Gagliano's notice of extension because if the notice was not valid, we need not reach the issue of whether Quad/Graphics was an assignee.

¶35 The body of law concerning the notice required to extend a lease deals almost exclusively with a tenant's right to extend. E.g., 2 Milton R. Friedman and Patrick A. Randolph, Jr., Friedman on Leases § 14:2, at 14-45 to -46 (5th ed. 2005) ("A tenant's right of renewal is generally, though not necessarily, conditioned on giving the landlord prior notice of the election to renew."); Robert S. Schoshinski, American Law of Landlord and Tenant § 9:4, 604 (1980) ("The mode of exercise of an option to renew or extend" usually requires "that notice be served on the lessor a specified time before expiration of the original term.").

¶36 In that circumstance, most states require a "tenant . . . [to] strictly comply with the notice provisions of an option contract."[10] 52 C.J.S. Landlord & Tenant § 94 (2014). This means that major departures from a prescribed method of notice can render a notice ineffective. For example, a notice may be invalid if it is late. Dyer v. Ryder Student Transp. Servs., Inc., 765 A.2d 858, 860 (R.I. 2001). The same holds true when a tenant utilizes a method of delivery different than

---

[10] See also 63 Am. Jur. Proof of Facts 3d 423 (2013) ("a provision in a lease requiring notice to a lessor of the lessee's election to exercise an option to renew or extend the lease must be strictly complied with").

16

the lease specified and the notice does not reach the landlord. W. Tire, Inc. v. Skrede, 307 N.W.2d 558, 562 (N.D. 1981). Still, "[s]mall variances [from the prescribed method of giving notice] will not make notice of renewal ineffective." 2 Friedman, supra § 14:2, at 14-47 (citing Beckenheimer's Inc. v. Alameda Assocs. Ltd. P'ship, 611 A.2d 105, 112-13 (Md. 1992) (failure to attach a notice of net worth that the lease required did not render notice invalid)).

¶37 Although we are required to determine in this case whether the contractual notice provisions have been satisfied, we note that in Wisconsin, the legislature has set forth the methods by which a tenant may provide notice of extension. Wis. Stat. § 704.21(2). These include giving notice to the landlord personally, giving notice to a competent person in charge of a landlord's place of business, and mailing the landlord notice by registered or certified mail. Id. If the landlord is a corporation, a tenant may provide notice to a corporate officer by these methods. § 704.21(3). Even if a tenant does not use one of the enumerated methods to provide notice, the notice is valid if the landlord has actual notice. § 704.21(5).[11]

¶38 As previously mentioned, the present case does not involve a tenant's notice to extend a lease. However, we consider that body of law relating to the sufficiency of a

---

[11] Actual notice by a landlord to a tenant is likewise statutorily sufficient in some circumstances, including notice to terminate a tenancy, notice to inspect a tenant's premises, and notice of an automatic renewal clause in a residential lease. Wis. Stat. § 704.21(5).

17

tenant's notice to extend in order to avoid imposing disparate standards on landlord and tenant, particularly in a commercial context.

¶39 Two possible documents potentially govern the issue of notice in the present case: the original May 22, 2000 lease and the subsequent amendment commencing October 23, 2003. The May 22, 2000 lease directed that Gagliano send notices to the tenant, Electronic Printing Systems, at the Jefferson Street address. The October 23, 2003 amendment provided that notices be sent to:

> OpenFirst, Inc., successor in interest to Electronic
> Printing Systems, Inc.
> c/o Robert Kraft
> 300 N. Jefferson St.
> Milwaukee, WI 53203

While the parties dispute which contractual notice provision governs, we need not resolve that issue because we conclude the notice was valid under both.

¶40 We begin with the May 22, 2000 lease, which Kraft claims controls. According to Kraft, Gagliano's notice was invalid because that lease said that notices should go to the "tenant," which on December 29, 2005 was New Electronic Printing Systems. Gagliano's notice did not name that entity, and instead went to Electronic Printing Systems, Robert Kraft, and others at the Jefferson Street address.

¶41 Gagliano's notice was valid under the May 22, 2000 lease for at least two reasons. First, the parties never amended the lease to designate New Electronic Printing Systems

18

as the tenant. Removing the October 23, 2003 amendment from consideration, the lease required Gagliano to send notices to Electronic Printing Systems at the Jefferson Street address. Gagliano did exactly that. Second, even if Kraft were correct that Gagliano was required to send the notice to New Electronic Printing Systems, Gagliano did that as well. Gagliano sent the notice to Kraft, an officer of New Electronic Printing Systems, at New Electronic Printing Systems' address. That Gagliano addressed the notice to an officer of New Electronic Printing Systems simply ensured that an appropriate individual within the entity received the notice.

¶42 Next, we consider the notice provision in the October 23, 2003 amendment. Gagliano claims that this document, not the May 22, 2000 lease, sets forth the controlling method of giving notice because the parties executed it after New Electronic Printing Systems acquired the leases. Under the amendment, Gagliano was to send notices to "OpenFirst, Inc., successor in interest to Electronic Printing Systems." Gagliano sent the notice to Openfirst, but did not designate that entity's status as "successor in interest to Electronic Printing Systems." Because Gagliano sent the correct entity the notice at the correct address, we cannot conclude that such an omission renders the notice invalid.

¶43 Finally, even if Gagliano's notice were defective under either document, undisputed evidence shows that New Electronic Printing Systems had actual notice that Gagliano was exercising a right of extension. Kraft admitted that he could

19

accept notices on behalf of New Electronic Printing Systems and that he did, in fact, receive Gagliano's notice. Although Kraft vigorously disputes whether Gagliano lawfully inserted a landlord's right of extension in the lease, he cannot reasonably contend that New Electronic Printing Systems was unaware that Gagliano was exercising what Gagliano asserted was its right to extend.

¶44 Having concluded the notice was valid, we affirm the portion of the decision of the court of appeals, albeit on different grounds.[12] We remand to the circuit court for

_____

[12] The court of appeals concluded that the notice of extension was valid for the following two reasons:

> (1) service was made on the correct entity ('Open First, Inc.'), and we see no reason not to apply the general principle that we disregard errors that 'do not affect substantial rights,' see Wis. Stat. Rule 805.18(1) (parenthetical text omitted); and (2) Open First, Inc., received the benefits of the May 18, 2001, lease and under the law we have already recognized was therefore bound by the . . . extension clause adopted by the May 18 lease.

Gagliano, 346 Wis. 2d 47, ¶31.

We disagree that there is "no reason not to apply" Wis. Stat. § 805.18(1). That statute applies to "any error or defect in the pleadings or proceedings," whereas the notice at issue in this case is purely contractual.

20

determination of Kraft's remaining arguments, including whether Gagliano fraudulently inserted the extension provision into the May 22, 2000 lease and whether that provision materially altered his obligations under the guarantee.[13] Because Quad/Graphics' liability can be determined independently of the notice issue, however, we turn to the issue of whether Quad/Graphics was an assignee of New Electronic Printing Systems.

### C. Summary Judgment

¶45 Quad/Graphics argues that the court of appeals erred in reversing the circuit court's grant of summary judgment because Quad/Graphics was a subtenant, not an assignee, of New Electronic Printing Systems and, therefore, was not liable to

---

As to the court of appeals' second rationale, we explain in the next section that we cannot allow the general principle that "[a] party that accepts a contract's benefits is bound to its burdens" to eviscerate the longstanding distinction between an assignment and a sublease. Id., ¶28. For the moment, however, we note that Gagliano concedes that it "did not appeal the trial court's ruling that Kraft did not guaranty the May 18, 2001 Lease . . . but . . . appeal[s] [only] the trial court's ruling that Kraft was not liable under his guaranty for the May 22, 2000 Lease, and its October 23, 2003 Amendment."

[13] Because Kraft prevailed on the notice issue at the circuit court level and did not receive a dispositive adverse determination from the circuit court on the fraud or guarantee issues, Kraft had no reason to cross appeal the circuit court's order directing a verdict in his favor. As such, we cannot say that he has abandoned these claims on appeal. Additionally, when Gagliano appealed the order of the circuit court, the court of appeals should not have decided the factual issue of fraud and the related factual issue of the guarantee. Gottsacker v. Monnier, 2005 WI 69, ¶35, 281 Wis. 2d 361, 697 N.W.2d 436 (the court of appeals cannot make factual determinations where the evidence is in dispute).

Gagliano for any unpaid rent. According to Quad/Graphics, the court of appeals ignored long-standing precedent that recognizes that a landlord may "recover unpaid rent from both its tenant and that tenant's 'assignee,' [but] may not do so from its tenant's mere 'subtenant.'"

¶46 Gagliano concedes that "a legitimate sublessee is [not] liable to the landlord for unpaid rent." Its argument is that Quad/Graphics was not a "legitimate sublessee" because it was an assignee, rather than a subtenant, since the primary lease prohibited subleasing without Gagliano's consent. Gagliano also argues that Quad/Graphics was actually an assignee because the substance of the transaction between New Electronic Printing Systems and Quad/Graphics transferred the entire remainder of the former's leasehold estate. We conclude that Quad/Graphics was not an assignee of New Electronic Printing Systems and, therefore, is not liable to Gagliano for any unpaid rent.

### 1. Assignment/Sublease general principles

¶47 As early as 1864, we recognized a principle dating back to feudal law that a tenant who transfers the entire remainder of his estate, thereby retaining no reversionary interest, creates an assignment of the lease, while a tenant who transfers something less, creates a new contractual relationship. Cross v. Upson, 17 Wis. 638 (*618), 643 (*623) (1864) (distinguishing between an assignment and "an under-tenancy, which is the relation ordinarily established between the lessee and the party in possession by proof that there was

22

no assignment"); 1 Milton R. Friedman and Patrick A. Randolph, Jr., Friedman on Leases § 7:4.3, at 7-85 (5th ed. Rel. #24, 2014) ("[t]he ancient technical system of feudal law based the landlord-tenant relation on the existence of a reversion"). We affirmed this distinction more recently in Cranston v. Bluhm, 33 Wis. 2d 192, 201, 147 N.W.2d 337 (1967), in which we explained:

> [T]he basic distinction between an assignment and a sublease is that by the former the lessee conveys his whole interest in the unexpired term leaving no reversion in himself, while the latter transfers a part only of the leased premises for a period less than the original term.

(quoting 3A George W. Thompson, Commentaries on the Modern Law of Real Property, § 1210, at 48-49 (1981)). Put another way, "an assignment is the transfer of the existing lease, whereas a sublease is the creation of a new tenancy between the original tenant and the subtenant." 5 Thompson on Real Property, Second Thomas Edition §42.04(d), at 324 (David A. Thomas & N. Gregory Smith eds., 2007).

¶48 This distinction is grounded in principles of privity of estate and privity of contract, both of which can be conveyed by a lease. Schoshinski, supra §§ 1:1, at 8:1. Privity of estate means "[a] mutual or successive relationship to the same right in property." Black's Law Dictionary 1320 (9th ed. 2009); see Schoshinski, supra § 8:1, at 532. To say that transferring privity of estate transfers the same rights in property is another way of saying that the transferee stands in the shoes of the transferor.

23

¶49 Privity of contract is a different creature. It refers to the contractual relationship between parties, who are, of course, free to negotiate for any term within the confines of the law. Schoshinski, supra § 8:1, at 532; see generally Queen Ins. Co. of Am. v. Kaiser, 27 Wis. 2d 571, 574, 135 N.W.2d 247 (1965) (quoting Anno. 175 A.L.R. 8, 86) ("the landlord and tenant relationship is not a matter of public interest, but relates exclusively to the private affairs of the parties concerned and that the two parties stand upon equal terms").

¶50 The distinction between assignment and sublease, or privity of estate and privity of contract, is paramount in this case. This is so because by accepting an "assignment——regardless of landlord's consent thereto——[an] assignee acquires an interest in the premises that brings him into privity of estate with the owner and makes him liable to the owner for the payment of rent and on those tenant covenants that run with the land." 1 Friedman, supra § 7:5.1, at 7-105; 52 C.J.S. Landlord & Tenant § 52 (2014) (an assignee "assumes [some of] the burdens, as well as the benefits, flowing from the original contract" for the entire term of the assignor's lease with the original landlord); Thomas, supra § 42.04(d), at 324 ("An assignment will . . . bind the assignee to all covenants that

24

run with the land . . ., including rent, . . . [while] a subtenant is bound only to the sublease itself.")[14]

¶51 In contrast, when an occupant is a subtenant, the subtenant is liable only to the tenant for the rent agreed upon between those parties. 1 Friedman, supra § 7:7.1, at 7-123 to -24. There is neither privity of estate nor privity of contract between landlord and subtenant. Id.

¶52 The decision of the court of appeals did not address this distinction. Quoting language from the November 4, 2002 Landlord's Consent Agreement in which Gagliano consented to the New Electronic Printing Systems' assignment of the leases as collateral to Associated Bank, the court of appeals concluded that Quad/Graphics was liable for rent owed under the extended leases because Gagliano conditioned its consent to the assignment upon any subsequent transferee assuming liability for the obligations under the leases. We cannot accept this reasoning.

¶53 Quad/Graphics was not party to the November 4, 2002 Landlord's Consent Agreement wherein Gagliano consented to New

---

[14] Gagliano claims that at least some of an assignee's obligations are now defined by statute. In Lincoln Fireproof Warehouse Co. v. Greusel, 199 Wis. 428, 437-38, 227 N.W. 6 (1929), we concluded that an assignee had no liability for the remaining term of a lease when the assignee abandoned the premises and the landlord accepted surrender and repossessed the property, thereby terminating privity of estate. Gagliano argues that the adoption of Wis. Stat. § 704.29(1) abrogates the ability of an assignee to avoid liability in this manner by providing that a landlord's claim for unpaid rent applies to assignees. Because we conclude that Quad/Graphics was a subtenant, not an assignee, we do not evaluate this argument.

25

Electronic Printing Systems' assignment of the leases as collateral to Associated Bank. Quad/Graphics also was not party to the November 6, 2002 Asset Purchase Agreement for which Gagliano consented to the principal tenants' assignment of the leases to New Electronic Printing Systems. Because Quad/Graphics was not a party to the Landlord's Consent Agreement on which the court of appeals relies, the obligations attendant to that contract do not apply to Quad/Graphics.

¶54 The court of appeals also reasoned that "Quad/Graphics accepted the benefits conferred by the Gagliano leases and their amendments, which were . . . disclosed to it in the July 6, 2006, Membership Interest Purchase Agreement. Therefore, Quad/Graphics cannot disclaim or avoid its liabilities for the burdens imposed by those leases and amendments—including the lease-extension terms." Gagliano, 346 Wis. 2d 47, ¶36. The problem with this conclusion, as Quad/Graphics points out in its brief, is that every occupant can be said to have "accepted the benefits" of the underlying lease in the broad sense used by the court of appeals. By this logic, all occupants would be

assignees, and the distinction between assignment and sublease would be swallowed whole.[15]

¶55 Having explained the distinctions between assignee and subtenant and relative obligations of each regarding payment of rent, we turn to the remaining issue in this review:  whether Quad/Graphics was an assignee of the Gagliano leases.

### 2.  Quad/Graphics' Status

¶56 In determining whether an occupant of a premises is an assignee or a subtenant of the original tenant, we begin with a presumption that an occupant, other than the original tenant who pays rent directly to the landlord, is an assignee of the original tenant, not a subtenant.  Cross, 17 Wis. at 643 (*623) ("the law infers an assignment from the fact of entry and occupation[; a] like presumption arises from payment of rent"); Mariner v. Crocker, 18 Wis. 264 (*251), 267 (*254) (1864) (citing Cross for "the presumption that a party found in possession of demised premises was there as assignee of the lessee"); 1 Friedman, supra § 7:5.1, at 7-107 ("When a party

---

[15] Additionally, we note that the cases the court of appeals cites for this proposition dealt with parties to an earlier contract.  Meyers v. Wells, 252 Wis. 352, 357, 31 N.W.2d 512 (1948) (employing a presumption that an employee who worked for several years after his employment contract expired continued to work under the terms and conditions of the contract); S & O Liquidating P'ship v. Comm'r, 291 F.3d 454, 459 (7th Cir. 2002) (quoting Skelton v. GM Corp., 860 F.2d 250, 260 (7th Cir. 1988)) (former partners in an accounting firm who signed a closing agreement could not participate in a global settlement because "[a] party who has accepted the benefits of a contract cannot 'have it both ways' by subsequently attempting to avoid its burdens").

other than the tenant is shown to be in possession of the premises, and paying rent therefor, there is a presumption that the lease has been assigned to him."). What is required in order to rebut this presumption is less clear.

¶57 The majority of cases "have treated a transfer of the entire term [of the lease]" as dispositive of an assignment. Thomas, supra § 42.04(d), at 326. Our statement in Cross that a party can rebut a presumption of assignment by showing that an occupant "charged as assignee never in fact had an assignment of the lease" seems to state the majority rule. Cross, 17 Wis. at 643 (*623).

¶58 In a later case citing Cross, however, we stated that "[a]ny language which shows the intention of the parties to transfer the property from one to the other is sufficient." Cranston, 33 Wis. 2d at 201 (quoting 3A Thompson, supra § 1210, at 51) (emphasis added). This focus on intent, rather than transfer in fact, seems to fall in line with an alternative line of cases that ask "whether the parties intended to assign the primary lease to the transferee, or intended to create a separate tenancy." Thomas, supra § 42.04(d), at 326 (collecting cases); see also Schoshinski, supra § 8:11, at 558 ("the most sensible way to distinguish between an assignment and a sublease is that adopted by the Arkansas court in Jaber v. Miller[16] 'that the intention of the parties is to govern.'")

---

[16] Jaber v. Miller, 239 S.W.2d 760, 764 (Ark. 1951).

28

¶59 It is unnecessary to delve further into this distinction at this time for two reasons. First, it may well be that "the intent approach adds little to the traditional analysis[] since courts will typically discern intent by looking to see whether a reversion or right of entry has been retained." Thomas, supra § 42.04(d), at 327. More importantly, the present case does not require us to decide between the approaches, even if they are distinct, because we conclude that Quad/Graphics and New Electronic Printing Systems intended to enter into a sublease and New Electronic Printing Systems did transfer less than its entire remaining leasehold estate.

¶60 Both approaches to the assignment/sublease distinction focus on the transaction between tenant and the subsequent occupant. As such, we begin with the two agreements those parties, New Electronic Printing Systems, who was the tenant at the relevant time, and Quad/Graphics, created on June 23, 2008: the Voluntary Surrender Agreement and the Sublease.

¶61 Quad/Graphics argues that the Sublease is the proper focus of our analysis. Quad/Graphics explains that the Voluntary Surrender Agreement expressly excludes the leases from surrender and that the parties entered into the Sublease in order to convey the portion of the leasehold estate necessary to affect the surrender of other collateral. The term of the Sublease was four months, ending October 31, 2008 or sooner upon 20 days notice by New Electronic Printing Systems. It did not

29

include the remainder of the extended leases, which continued to June 23, 2010 and January 23, 2012, respectively.[17]

¶62 We agree with Quad/Graphics that the Sublease is sufficient to show that New Electronic Printing Systems did not intend to and did not convey its entire leasehold estate because only four months of the remaining lease term were conveyed. Also, the lease unequivocally shows that the parties intended to enter into a sublease. The parties labeled the document a sublease, provided that Quad/Graphics would have "no liability under any lease of the Premises from the fee owner thereof" and "no obligations to [Gagliano] arising out of or relat[ing] to this Sublease," and that Quad/Graphics was "not assuming the Primary Lease." See Tufail, 348 Wis. 2d 631, ¶25 (quoting Kernz v. J.L. French Corp., 2003 WI App 140, ¶9, 266 Wis. 2d 124, 667 N.W.2d 751 (in attempting to give effect to contracting parties' intentions, "unambiguous contract language controls").

¶63 Gagliano argues that the Sublease was invalid because the primary lease prohibited subleasing without Gagliano's consent, which New Electronic Printing Systems never obtained. Gagliano asks us to classify the document as an assignment; however, the primary lease likewise prohibited assignments without Gagliano's consent. Perhaps in anticipation of the logical problem this argument presents, Gagliano casts his

---

[17] This statement should not be interpreted as our view that Kraft's allegation that Gagliano improperly inserted a right to extend into the leases has no merit. As explained previously, we take no position on this issue, and remand it to the circuit court.

argument in terms of fairness to the landlord. Specifically, he contends that the invalid Sublease may not be used "for any purpose" and may not "limit the landlord's rights." We find no support in the law for adding a consideration of fairness to the landlord to the test for determining whether a subsequent occupant becomes a sublessee or an assignee.

¶64 As with the leases in the present case, the lease in Cross required the landlord's consent to sublet or assign, which the tenant did not obtain, yet we concluded that the tenant could rebut the presumption of assignment by the actions of the parties. Cross, 17 Wis. at 640, 643 (*620-21, 623). This is so because an occupant charged with an assignment need not prove the validity of a sublease, but rather must rebut the presumption of an assignment. See id. at 643 (*623) (an occupant that enters with the lessee's consent, but without assignment, "must be an under-tenancy of some kind, for years, from year to year, at will or by sufferance"); see generally Lamonts Apparel, Inc. v. SI-Lloyd Assocs., 967 P.2d 905, 908 (Or. Ct. App. 1998) (concluding that a contract that did not meet the requirements for a valid assignment or sublease did not trigger the obligations of either, thus illustrating the basic principle that assignment and sublease are not the only two types of leasehold estates). As such, we conclude that although a sublease entered into without the landlord's consent may be voidable at the election of the landlord and give rise to a breach of contract claim, it can be used for the purpose of rebutting a presumption of assignment.

31

¶65 Although fairness to the landlord does not appear to be a proper consideration when determining whether a transfer is a sublease or assignment, we nonetheless note that our conclusion does not "limit the landlord's rights," as Gagliano contends, because the landlord does not have the right to treat any sublease in violation of the primary lease as an assignment. The landlord's rights in such a situation are limited to eviction of the subtenant and breach of contract action against the primary tenant. John F. Thompson, 2 Wisconsin Property Law Series: Drafting Commercial Leases 21 (1968) ("If [a] lease contains a provision prohibiting the assignment or subletting without the consent of the landlord, and a tenant does in violation of this provision sublet or assign without the consent of the landlord, such action on the part of the tenant constitutes a breach of the lease, justifying termination of the lease or any other remedy available to the landlord."). To conclude otherwise would be to hold a nonparty to the primary lease liable for the primary tenant's breach.

¶66 Gagliano's second argument is that although the Sublease may have purported to transfer only a portion of the remaining leasehold estate, the substance of the transaction as a whole transferred the entire remainder. Specifically, Gagliano contends that because the Voluntary Surrender Agreement "gave Quad/Graphics the exclusive right to occupy the leased premises for the remaining lease term" and "did not provide New [Electronic Printing Systems] with any reversionary interest in the premises" the transaction constituted an assignment of the

leases. Quad/Graphics' right to occupy was exclusive, according to Gagliano, because Quad/Graphics had complete control over the conditions by which New Electronic Printing Systems could end Quad/Graphic's right to store its collateral: satisfaction of New Electronic Printing Systems obligations to Quad/Graphics in full or disposition of the collateral. In sum, Gagliano argues that the "character of the agreement" was an assignment, not a sublease. Again, we disagree.

¶67 The Voluntary Surrender Agreement did not transfer the May 22, 2000 lease from New Electronic Printing Systems to Quad/Graphics because the tenant under the lease and the subsequent occupant had different rights. For example, under the Voluntary Surrender Agreement, Quad/Graphics could end its obligation to pay rent by disposing of the collateral. New Electronic Printing Systems had no such ability under the leases with Gagliano. The Voluntary Surrender Agreement also provided that New Electronic Printing Systems could terminate Quad/Graphics' right to store collateral by satisfying its obligations in full to Quad/Graphics. Again, New Electronic Printing Systems had no such right under the leases with Gagliano. Because the terms of the May 22, 2000 lease and Voluntary Surrender Agreement so differ, we cannot say that New Electronic Printing Systems assigned the lease to Quad/Graphics. See Lamonts Apparel, 967 P.2d at 908 (concluding that there is no assignment when a purported sublease differs from the primary lease in significant respects). That Quad/Graphics, not New Electronic Printing Systems, was the party who could satisfy the

33

conditions necessary to end Quad/Graphics' obligations to New Electronic Printing Systems under the Sublease is not germane. The question is whether New Electronic Printing Systems transferred or intended to assign the Gagliano leases to Quad/Graphics. That Quad/Graphics could end its obligation to pay rent before the May 22, 2000 lease expired on June 23, 2010 is support for our conclusion that New Electronic Printing Systems did not make an assignment.

¶68 Furthermore, Gagliano's focus on the Voluntary Surrender Agreement is misplaced because that agreement specifically excluded the leases that underlie this action from what was being surrendered when it stated, "[f]or the avoidance of doubt, the Collateral shall not include any lease for real property of which any Debtor is a party." We conclude that the Sublease and Voluntary Surrender Agreement, when taken together, show that New Electronic Printing Systems and Quad/Graphics intended a sublease. Whether the Sublease was not "legitimate," i.e., entered into without Gagliano's consent, is of little concern because it did not transfer the entire remainder of New Electronic Printing Systems' leasehold estate to Quad/Graphics.

¶69 Having concluded that Quad/Graphics was not an assignee of New Electronic Printing Systems' lease, we also conclude that Gagliano cannot recover rent allegedly owed under the extended leases based on privity of estate. Accordingly, we reverse the portion of the decision of the court of appeals that reversed an order of the circuit court granting Quad/Graphics' motion for summary judgment.

34

III. CONCLUSION

¶70 This case presents two issues for our review: (1) whether Gagliano gave sufficient notice to extend the leases to the time when the alleged breach occurred; and (2) whether Quad/Graphics was a subtenant of the lessee or an assignee of the leases. As to the first issue, we conclude that Gagliano's notice was valid. Gagliano provided notice: (1) to the entity designated as the tenant on the original lease; (2) to the entity who was the current tenant at the time of the notice; and (3) to the entity a subsequent amendment of the lease designated as the tenant. The notice is also valid because the current tenant at the time Gagliano sent the notice had actual notice that Gagliano was exercising its alleged right to extend the leases. Accordingly, we affirm the portion of the decision of the court of appeals that reversed the circuit court's directed verdict, which had concluded that Gagliano's notice was not valid. We remand to the circuit court for fact-finding necessary to decide the merits of Kraft's remaining arguments relating to the lawfulness of the extension provision in the leases.

¶71 In regard to the second issue, we conclude that Quad/Graphics is not liable to Gagliano because Quad/Graphics was a subtenant of the lessee, not an assignee of the leases. Undisputed evidence shows that New Electronic Printing Systems, the assignee of the original tenants, did not transfer its entire remaining leasehold estate to Quad/Graphics. Because Gagliano and Quad/Graphics did not share privity of estate, it

is not an assignee. Therefore, we do not hold Quad/Graphics liable for New Electronic Printing Systems' alleged breach of contract to which Quad/Graphics was not a party. Accordingly, we reverse the portion of the decision of the court of appeals that reversed the order of the circuit court granting summary judgment in favor of Quad/Graphics and remand to the circuit court for dismissal of all claims against Quad/Graphics.

*By the Court.*—The decision of the court of appeals is affirmed in part, reversed in part and the cause remanded to the circuit court.

¶72 ANN WALSH BRADLEY, J. *(concurring in part, dissenting in part).* This case addresses two issues: (1) whether Quad/Graphics was a subtenant or assignee and (2) whether the notice of lease extension that Gagliano provided was legally sufficient.

¶73 I agree with the majority when it concludes that Quad Graphics is a subtenant. Because the tenant did not transfer all rights in the lease to Quad Graphics and it was not in privity of estate with the landlord, Quad Graphics was not an assignee. Therefore, I join Part C of the majority opinion.

¶74 However, I part ways with the majority on the issue of the sufficiency of the notice. For the reasons set forth in the dissent, I agree that the majority opinion is not convincing as a matter of statutory interpretation or corporate and agency law. Therefore, I join Part I of the dissent.

¶75 Accordingly, I respectfully concur in part and dissent in part.

¶76 SHIRLEY S. ABRAHAMSON, C.J. *(dissenting).* The instant case seems to present a complex fact and legal situation, although the court of appeals discounted the complexity, writing that "this appeal has a veneer of complexity."[1]

¶77 I write only on the issue of the sufficiency of the landlord's notice to the tenant of the extension of the lease. This case presents a narrow issue: What does a landlord have to do to give notice to a tenant corporation of an extension of the commercial lease, when the lease and the statutes are silent on the issue of notice? Notice is a dispositive issue in the instant case, majority op., ¶34, and I need not address other issues addressed by the majority opinion.

¶78 The majority opinion phrases the question to be answered as "whether a landlord's contractual notice to a tenant is sufficient when an appropriate person receives that notice at the appropriate address, but the notice does not indicate in what capacity the recipient of the notice is being addressed." Majority op., ¶31.

¶79 The majority opinion loses sight of the fact that an individual in his or her personal capacity, an individual in his or her representative capacity, and a corporation are separate and apart under the law. Robert Kraft individually; Robert Kraft as president of the corporation, New Electronic Printing Systems; and the current corporate tenant itself, New Electronic

---

[1] Anthony Gagliano & Co., Inc. v. Openfirst, LLC, 2013 WI App 19, ¶26, 346 Wis. 2d 47, 828 N.W.2d 268.

1

Printing Systems are, under the law, three different, separate persons.

¶80 These distinct persons complicate the issue of sufficiency of notice, which arises in numerous situations——some regulated by statute, others by contract or the like. When the person to be notified is a corporation, the identity of the appropriate individual to receive notice depends on the facts and circumstances of each situation. Notice to a corporation is governed by the general principle that a "corporation enjoys a legal identity separate and apart from its shareholders, directors, and officers."[2]

¶81 Deciding whether the notice given is sufficient to be notice to the corporation includes such issues as: to what individual notice must be given to give notice to the corporation; when, how, and where notice must be given; whether notice was in strict compliance with the applicable requirements; whether notice was in substantial compliance with the applicable requirements;[3] and whether actual notice (that is,

---

[2] 1 William Meade Fletcher et al., Cyclopedia of the Law of Corporations § 25 (perm. ed., rev. vol. 2006) (citing, inter alia, Security Bank v. Klicker, 142 Wis. 2d 289, 418 N.W.2d 27 (1987)).

[3] The majority opinion is correct in stating that small variances generally will not make notice ineffective. Majority op., ¶36 (citing Beckenheimer's Inc. v. Alameda Assocs. Ltd. P'ship, 611 A.2d 105, 112-13 (Md. 1992)). However, the case cited by the majority opinion does not necessarily illustrate the minuteness of variances allowed because the case also involves ambiguous terms being construed against the plaintiff. Beckenheimer's Inc., 611 A.2d at 111.

knowledge) can overcome notice that does not comply with the applicable requirements.

¶82 Numerous leases and amendments were negotiated in the instant case. The tenant corporation kept changing, at least in name. The leases and amendments do not always state the name of the corporation that is the tenant; some merely state notice is to be given to "the tenant." The leases and amendments in the instant case do not always reveal the individual to whom notice is to be given to constitute notice to a corporation tenant.

¶83 The majority opinion concludes that the landlord's addressing the notice to Robert Kraft "ensured that an appropriate individual within the [corporate] entity received the notice." Majority op., ¶41.

¶84 The majority opinion's conclusion is based on two faulty reasons:

> (1) The majority opinion applies Wis. Stat. § 704.21(3) to the instant case. This statute provides that notice by a tenant to a corporation landlord may be conveyed by notice to an officer of the corporation. The statute, however, explicitly governs only a tenant's

---

More analogous examples include American Oil Co. v. Rasar, 308 S.W.2d 486, 491 (Tenn. 1957) (reasoning that notice was invalid because it was sent to the original lessors when the lease required notice to be sent to assignees of lessors); Western Tire, Inc. v. Skrede, 307 N.W.2d 558, 562 (N.D. 1981) (reasoning that notice was invalid because the notice was sent by ordinary mail instead of certified or registered mail); and Bernier v. Benson, 159 N.E.2d 39, 41 (Ill. Ct. App. 1959) (reasoning that notice was invalid when notice was provided by a partnership, but the lessees actually were the individuals that made up the partnership).

3

notice to a landlord of extension of a lease, and the present case involves a landlord's notice to a tenant. Majority op., ¶37-38.

(2) Without analysis of corporation and agency law recognizing the separateness of a corporation and individuals associated with the corporation, the majority opinion treats an individual who is guarantor, an individual who is an officer of the corporation, and the corporation as if they are one and the same.

¶85 Robert Kraft is an officer of New Electronic Printing Systems. Robert Kraft was not the "tenant." New Electronic Printing Systems was the tenant. The landlord knew that New Electronic Printing Systems was the tenant. Robert Kraft, individually, was a guarantor under the lease. A careful landlord would have given Robert Kraft notice in his individual capacity as a guarantor to protect the landlord's rights against the guarantor.

¶86 I dissent because I am not persuaded by the majority opinion's reasoning and believe that it may have troublesome, unforeseen consequences.

I

¶87 To reach its result, the majority opinion misapplies Wis. Stat. § 704.21 to the notice at issue in the present case——a landlord's notice to the tenant of extension of the lease. This statute explicitly regulates only a tenant's notice to a landlord to extend a lease. See majority op., ¶37. The

4

legislature singled out a tenant's extensions of leases and enacted a statute to govern tenants, not landlords.

¶88 Contrary to the plain text of the statute, the majority opinion expands the statute to govern the landlord's notice to a tenant in the present case.

¶89 The majority opinion does not use the usual tools of statutory interpretation to extend the statute beyond its text in the present case; the majority opinion does not analyze the text, context, purpose, or statutory or legislative history.[4]

¶90 Rather, the majority opinion reasons that the <u>court</u> does not want to create "disparate standards" on landlord and tenant, particularly for commercial tenants and commercial landlords. Majority op., ¶38. "Why not?" I ask. No answer is given in the majority opinion.

¶91 Thus, the majority opinion is not convincing as a matter of statutory interpretation. The majority opinion relies on a statute that by its very words does not apply to the instant case and now leaves many questions unanswered regarding the statute's applicability to other landlord-tenant agreements and disputes.

¶92 The majority opinion is not convincing as a matter of corporate law and agency law. The majority opinion conflates the individual, Kraft, and the corporate entity, New Electronic Printing Systems. The circumstances of the instant case do not bear out this conflation of the person and the corporation.

---

[4] <u>See</u> majority op., ¶37-38.

5

¶93 Robert Kraft's admission that he could accept notice on behalf of the corporation does not mean that, in the instant case, notice to Kraft in his personal capacity constituted notice to the corporation. Rather, the general rule is that notice to an officer of a corporation is notice to a corporation only when, amongst other requirements, the "notice . . . comes to . . . the agent in his or her official or representative capacity."[5] Put differently, "[s]uch notice, to be binding upon the principal, must be notice to the agent when acting within the scope of his agency, and must relate to the business, or, as most of the authorities have it, the very business, in which he is engaged, or is represented as being engaged, by authority of his principal." Congar v. Chicago & N.W. Ry. Co., 24 Wis. 157, 160 (1869).[6]

¶94 In the instant case, Robert Kraft was not named in the notice in his representative capacity and nothing in the record demonstrates that Kraft accepted service of notice in his representative capacity on behalf of New Electronic Printing

---

[5] 3 William Meade Fletcher et al,, Cyclopedia of the Law of Corporations § 793, at 34-35 (perm. ed., rev. vol. 2010). See also Tele-Port, Inc. v. Ameritech Mobile Communic'ns, 2001 WI App 261, ¶7, 248 Wis. 2d 846, 637 N.W.2d 782 ("[C]orporation is charged with constructive knowledge, regardless of its actual knowledge, of all material facts of which its officer or agent receives notice or acquires knowledge while acting in the course of his employment within the scope of his authority . . . .") (emphasis added, internal quotation marks omitted).

[6] See also 1 Restatement (Third) of Agency § 5.02(1) (2006) ("A notification given to an agent is effective as notice to the principal if the agent has actual or apparent authority to receive the notification . . . .") (emphasis added).

Systems.[7] The notice of lease extension document did not state that notice was given to Robert Kraft in his representative capacity on behalf of New Electronic Printing Systems. Indeed, no reference was made to New Electronic Printing Systems anywhere in the notice. Simply because Kraft was an officer of New Electronic Printing Systems does not mean he was provided notice in a representative capacity.

¶95 In the instant case, Robert Kraft, as an individual, was a guarantor under the lease and would have received notice in his individual capacity.

¶96 Notice came to Robert Kraft in his individual capacity; he had an individual interest in the matter. Notice did not come to Robert Kraft in his representative capacity or regarding his actual or apparent authority to act as agent of New Electronic Printing Systems.[8] Whether notice to Robert Kraft individually was notice to the corporation might well be a question of fact requiring resolution at trial.[9]

II

¶97 If the reader is not persuaded that notice to Robert Kraft in his individual capacity was notice to the corporation, the majority opinion provides a fail-safe reason justifying the sufficiency of the notice, assuring us that the corporation had

---

[7] Kraft was identified in the landlord's notice of extension as "Robert Kraft," rather than "New Electronic Printing Systems c/o Robert Kraft" or similar language.

[8] See 3 Fletcher, supra note 5, § 793, at 35.

[9] See id.

7

"actual notice" that the landlord was extending the lease.[10]   In a single conclusory sentence, the majority opinion declares that Robert Kraft "cannot reasonably contend that New Electronic Printing Systems was unaware that [the landlord] was exercising what [the landlord] asserted was its right to extend." Majority op., ¶43.  "Why not?" I ask.

¶98  The majority opinion speaks of "actual notice" and "awareness," but the majority opinion obviously means "knowledge."   The majority opinion imputes Robert Kraft's knowledge of the landlord's extension of the lease to the corporation, without considering that "[t]here may be a difference between the effect of notice expressly given an officer or agent of a corporation, as binding the corporation, and knowledge acquired by such an officer or agent."[11]   Again, the majority opinion conflates the individual and the corporate entity.

¶99  In any event, the general rule is that a corporation is charged with constructive knowledge, regardless of its actual knowledge, of all material facts of which its officer or agent receives notice or acquires knowledge while acting within the scope of his or her authority, but does not have constructive knowledge of facts learned by its officer or agent outside the scope of his or her agency:[12]

---

[10] Majority op., ¶2.

[11] Notice and knowledge need not have the same effect.   3 Fletcher, supra note 5, § 791.

[12] See Congar v. Chicago & N.W. Ry. Co., 24 Wis. 157, 160 (1869); 3 Fletcher, supra note 5, § 790, at 16-17, 26.

8

> Knowledge acquired or notice received by an agent which does not pertain to the duties of the agent, which does not relate to the subject matter of the employment, or which affects matters outside the scope of his [or her] agency is not chargeable to the principal unless actually communicated to [the principal].[13]

¶100 The majority opinion does not tackle this question of imputing Robert Kraft's knowledge to the corporation in a satisfactory manner.

¶101 Because the majority opinion fails to explain or employ the applicable rules of landlord-tenant law, corporate law, and agency law to the instant case, and fails to furnish a persuasive rationale that governs the present case or will govern other cases involving notice to a corporation and knowledge of a corporation, I do not join this part of the majority opinion.

---

[13] _Philipp Lithographing Co. v. Babich_, 27 Wis. 2d 645, 650 n.4, 135 N.W.2d 343 (1965) (quoting 3 Am. Jur. 2d Agency § 276, at 639).

9