PATIENCE DRAKE ROGGENSACK, C.J.

{dissenting).

¶ 47. The review before us arises from sum-
mary judgment. I conclude that defendants,[1] as the *518 moving party to whom summary judgment was granted, failed to make a prima facie showing of sufficient undisputed, material facts that North Highland Inc.'s bid to construct and supply Tyson Foods, Inc. with 3,000 trolleys, (the Trolley Contract) did not meet the definition of a trade secret as set out in Wis. Stat. § 134.90(1)(c), which Fredrick A. Wells (Wells) and Jefferson Machine & Tool, Inc. (Jefferson Machine) misappropriated. Leske v. Leske, 197 Wis. 2d 92, 96-97, 539 N.W.2d 719 (1995).
f 48. Defendants also failed to make a prima facie showing of sufficient undisputed, material facts that Wells, Jefferson Machine and Dwain D. Trewyn (Trewyn) did not obtain or use North Highland's Trolley Contract bid information contrary to Wis. Stat. § 134.90(2). Id. Accordingly, I conclude that summary judgment was improperly granted dismissing North Highland's claim for trade secret misappropriation against Wells and Jefferson Machine.
f 49. And finally, I conclude that claim preclusion cannot be applied against North Highland based on the Stipulation and Order that dismissed Trewyn from this lawsuit. Therefore, I would reverse the decision of the court of appeals and remand for a jury trial of North Highland's claim against Wells and Jefferson Machine for misappropriation of a trade secret.[2]
*519 I. BACKGROUND
1. Parties
f 50. The Trolley Contract to fabricate and deliver 3,000 stainless steel twin trolley assemblies for Tyson's Council Bluff, Iowa facility is central to this dispute.
¶ 51. Trewyn worked for North Highland as a salesman until the end of December 2011. As part of his job, he bid, sometimes referred to as "quoted," on potential contracts for work that North Highland hoped to obtain.
¶ 52. Trewyn agreed to be subject to the confidentiality restrictions contained in North Highland's Associate Handbook. It provided in relevant part:
[D]o not discuss confidential business with anyone who does not work for North Highland Inc. Such confidential information includes, but is not limited to ... pending projects and proposals, pricing or costing information .... Anyone who discloses trade secrets or confidential business information will be subject to disciplinary action, up to and including termination of employment and legal action, even if he/she does not actually benefit from the disclosed information.![3]]
¶ 53. In September of 2011, Wells incorporated Jefferson Machine. Trewyn and Wells were the sole shareholders, with Wells owning 75% and Trewyn owning 25%. Wells and Trewyn also were the sole employees of Jefferson Machine.
¶ 54. This lawsuit arose out of actions of Trewyn, while he was employed by North Highland, and of Wells, who knew that Trewyn was a salesman for North Highland at the time Trewyn and Wells prepared the Trolley Contract bid for Jefferson Machine *520 that competed with North Highland's bid. A lengthy deposition was taken of Wells by an attorney for North Highland. The quotes below are from that deposition, Record 47, unless indicated otherwise.[4]
2. Bidding process
f 55. On November 11, 2011, Tyson sent a RFQ (request for quotes) on the Trolley Contract to a number of businesses. North Highland was on the RFQ list. Jefferson Machine was not.[5] Bids ("quotes") were not accepted by Tyson Foods unless the bidder was on Tyson's list of authorized bidders.
¶ 56. However, on December 1, 2011, Trewyn faxed Jefferson Machine's bid on the Trolley Contract to Tyson. On the cover sheet of the bid Trewyn said, "I received permission to quote the trolley assy's from Ray R. I hope that is not a problem."[6] Wells was aware of this. At his deposition, Wells testified:
Q And Dwain was the one who got the opportunity for Jefferson Machine & Tool to bid on the trolley contract?
A Yes.[7]
f 57. Trewyn and Wells[8] developed Jefferson Machine's bid on the Trolley Contract. Wells testified:
*521 Q That's Exhibit 5. That is Dwain's quote on Jefferson Machine & Tool's behalf for the trolleys.
A Okay.
Q Do you remember that?
A Yes, Dwain put this together.
Q And Dwain told you about it?
A Yes.t[9]]
¶ 58. It is undisputed that Trewyn was an employee of North Highland when he and Wells submitted Jefferson Machine's bid.[10] Wells knew that Trewyn was employed at North Highland at that time. He testified:
Q Do you remember when you got the trolley contract?
A I don't recall the date.
Q It was in December of 2011, right?
A I believe so.
Q Do you know when Dwain quit his job at North Highland?
A In December, end of December.
Q The end of December?
A Yes.
Q After Jefferson Machine & Tool got the trolley contract?
*522 A Yes.[11]
¶ 59. Wells also acknowledged that he knew that Jefferson Machine was a competing business of North Highland. He testified:
Q So Jefferson Machine & Tool was a competing business of North Highland?
A It's the American way. You can compete. There's competitors all up and down the highway here for machine houses, injection molders, vacuum formers, fabricators. Look in the phone book.
Q So you'd like to change your answer, yes, they are competing businesses?
A They could be.[12]
¶ 60. However, we can infer from Wells' testimony that he believed he and Trewyn could use North Highland's bid information because Trewyn did not have a non-compete agreement with North Highland. He testified:
Q Did you think that North Highland had any right to have its employees not compete with them at the same time as they were employed at North Highland?
A Say that again.
Q Did you think that North Highland had any right to have its employees not compete against them while they were still employed at North Highland?
A There was no non-compete form with them.
[[Image here]]
*523 Q And the reason why you think they don't have that right is because they didn't have an express non-compete clause in their employment contract?
A Yes.[13]
¶ 61. Wells was actively involved in bidding on the Trolley Contract. He testified:
Q This is Exhibit 2. I'm going to show you email 6. That is an email from Gordon Slothower to you and Dwain, right?
A Yes.
Q And the email right on the top, it starts, "Attached is the revised," do you see where I'm pointing to?
A Yes.
Q Why was he giving you a revised trolley drawing?
A I don’t know. He copied me on whatever he sent to Dwain.
[[Image here]]
Q Well, when you're putting together the quote, the number, how much you would bid on the trolley contract, how would you formulate the number?
A By the quotes on the raw material and the machining time and the assembly time to put the part together.
[[Image here]]
Q For the trolley contract at Jefferson Machine & Tool, were you aware that Tyson asked for samples of the trolleys to be created?
*524 A Yes.[14]
¶ 62. Jefferson Machine underbid North Highland and was awarded the Trolley Contract. This lawsuit followed. North Highland claimed for misappropriation of trade secrets, alleging that Trewyn took its Trolley Contract bid and Wells, who had reason to know that it was improper for Trewyn to disclose and use North Highland's bid, aided and abetted Trewyn and Jefferson Machine in the misappropriation of North Highland's trade secret. A jury trial was demanded in the complaint.
f 63. The circuit court granted summary judgment to defendants, dismissing the complaint. The court of appeals affirmed, based on its conclusion that North Highland had not proved that a bid was the type of information set forth in Wis. Stat. § 134.90(1)(c). North Highland Inc. v. Jefferson Mach. & Tool Inc., No. 2015AP643, unpublished slip op. (Wis. Ct. App. April 28, 2016). The court of appeals opined, "As the party seeking trade secret protection, it is North Highland's burden to establish that the amount of its bid for the Tyson project constitutes a trade secret." Id., ¶ 26 (citing Wisconsin Elec. Power Co. v. PSC, 106 Wis. 2d 142, 146, 316 N.W.2d 120 (1981), which interpreted Wis. Stat. § 943.205(2)(1975) and not § 134.90).
II. DISCUSSION
A. Standard of Review
¶ 64. Whether a bid is a trade secret because it is a compilation of costs, labor and profit that has independent economic value from not being generally *525 known to or readily ascertainable by proper means by competitors, and for which reasonable efforts to maintain its secrecy were taken, presents questions of fact. Minuteman, Inc. v. Alexander, 147 Wis. 2d 842, 849, 434 N.W.2d 773 (1989).
f 65. Wisconsin Stat. § 134.90 is Wisconsin's enactment of the Uniform Trade Secrets Act. Id. at 851. Sub section (7) provides:
UNIFORMITY OF APPLICATION AND CONSTRUCTION. This Section shall be applied and construed to make uniform the law relating to misappropriation of trade secrets among states enacting substantially identical laws.
We have recognized and followed the statutory directive for Wisconsin's enactments of uniform laws in other decisions. For example in Estate of Matteson, we said,
The purpose of uniform laws is to establish both uniformity of statutory law and uniformity of case law construing the statutes, ensuring certainty and guidance to litigants who rely on courts to interpret uniform statutes in a predictable and consistent manner.
Estate of Matteson v. Matteson, 2008 WI 48, ¶ 42, 309 Wis. 2d 311, 749 N.W.2d 557.
¶ 66. It is the majority view of those courts that have considered the standard of review that whether a trade secret exists is a question of fact. See, e.g., All West Pet Supply v. Hill's Pet Products, 840 F. Supp. 1433, 1437—38 (D. Kan. 1993); Network Telecommunications, Inc. v. Boor-Crepeau, 790 P.2d 901, 902 (Colo. App. 1990); Defiance Button Mach. Co. v. C&C Metal Products Corp., 759 F.2d 1053, 1063 (2d Cir. 1985).
¶ 67. In order to provide the benefits of the Uniform Trade Secrets Act to Wisconsin litigants, Wisconsin courts should employ the majority interpre *526 tation for the standard of review accorded to trade secret claims. Accordingly, I conclude that whether a trade secret exists under Wis. Stat. § 134.90 is a question of fact to be determined by the trier of fact.
¶ 68. We independently review whether North Highland's complaint was properly dismissed on summary judgment. Burbank Grease Services, LLC v. Sokolowski, 2006 WI 103, ¶ 6, 294 Wis. 2d 274, 717 N.W.2d 781. In order to affirm summary judgment dismissing North Highland's trade secret claim, we would be required to conclude that the defendants made a prima facie showing of sufficient, undisputed material facts that North Highland's bid for the Trolley Contract was not a trade secret, which Wells, Jefferson Machine and Trewyn did not misappropriate. Leske, 197 Wis. 2d at 97-98. "A statement that the plaintiff lacks evidence is insufficient" to meet the moving party's burden at summary judgment. Id. at 97.
f 69. Here, the interpretation of Wis. Stat. § 134.90 is intertwined with summary judgment. The interpretation and application of a statute present questions of law that we review independent of the decisions of the court of appeals and circuit court, but benefitting from their discussions. State v. Duchow, 2008 WI 57, ¶ 11, 310 Wis. 2d 1, 749 N.W.2d 913 (citing Marder v. Bd. of Regents of the Univ. of Wis. Sys., 2005 WI 159, ¶ 19, 286 Wis. 2d 252, 706 N.W.2d 110).
¶ 70. And finally, whether claim preclusion was correctly applied by the circuit court is a question of law for our independent review. Lindas v. Cady, 183 Wis. 2d 547, 552, 515 N.W. 458 (1994).
*527 B. Trade Secret
1. General principles
¶ 71. Trade secret law in Wisconsin is established by Wis. Stat. § 134.90. Section 134.90 made significant changes in trade secret law from that which was formerly set out in Wis. Stat. § 943.205(2) (1975). For example, Wisconsin courts interpreted § 943.205(2) (1975) by following Restatement (First) Torts § 757, cmt. b (1939). See, e.g., Abbott Laboratories v. Norse Chemical Corp., 33 Wis. 2d 445, 147 N.W.2d 529 (1967) and Gary Van Zeeland Talent, Inc. v. Sandas, 84 Wis. 2d 202, 267 N.W.2d 242 (1978).
¶ 72. The Restatement (First) of Torts § 757, cmt. b (1939) engrafted a "continuous use requirement" onto the statutory definition of trade secret, as did Wisconsin's appellate courts. For example, Wisconsin Elec. Power Co., 106 Wis. 2d at 147-48, directed that in order to find protection under Wisconsin's trade secret law a party must show that the information does not relate "to single or ephemeral events in the conduct of the business, as, for example, the amount or other terms of a secret bid for a contract," but rather the information must be "continually used in the operation of the business." Id. at 147-48 (quoting Restatement of Torts (First) § 757, cmt. b (1939)).
¶ 73. In Corroon v. Hosch, 109 Wis. 2d 290, 295, 325 N.W.2d 883 (1982), we affirmed that Wisconsin's former trade secret statute, Wis. Stat. § 943.205(2) (1975), incorporated the definition of Restatement (First) Torts § 757, cmt. b (1939). Many other states did the same before the Uniform Trade Secret Act was promulgated by the Uniform Law Commission. See Richard F. Dole, Jr., The Contours of American Trade *528 Secret Law: What Is and What Isn't Protectable as a Trade Secret, 19 (SMU Sci. & Tech. L. Rev. 89) (2016).
¶ 74. However, the continuous use doctrine no longer affects trade secret law in Wisconsin. This is so because in 1986, Wisconsin enacted the Uniform Trade Secret Act. Wis. Stat. § 134.90 (1986). Section 134.90 created a new definition of trade secret that changed the Restatement's definition in part because § 134.90 eliminated the continuous use requirement from trade secret law. Minuteman, 147 Wis. 2d at 852-53 (citing Uniform Trade Secrets Act, sec. I, comment, 14 U.L.A. 543 (1985)).
¶ 75. In Minuteman, we carefully examined the Uniform Trade Secret Act as set out in Wis. Stat. § 134.90, and explained that by enacting § 134.90, Wisconsin "created a new definition of trade secret." Id. We addressed specific provisions of Wis. Stat. § 134.90 in order to emphasize that in addition to adopting a new definition of trade secret, legal principles that may have affected trade secret law in the past were no longer applicable in Wisconsin. We identified § 134.90(6) as we explained that trade secret law had been changed significantly. Subsection (6) provides:
(6) Effect on other laws. . . (a) Except as provided in par. (b), this section displaces conflicting tort law, restitutionary law and any other law of this state providing a civil remedy for misappropriation of a trade secret.
Id. at 852 (footnote omitted).
f 76. Because we had employed Restatement (First) of Torts' definition of trade secret in Corroon and Wis. Stat. § 134.90 changed the definition of trade secret, we directed that "[t]he test established in *529 Corroon [] is [] no longer the legal standard" for determining what may qualify as a trade secret. Id. at 852. We explicitly provided that the definition of trade secret no longer has a continuous use requirement. Id. at 852-53.
2. Bid as a trade secret
¶ 77. We have not considered whether a bid may be found to be a trade secret since Wisconsin enacted the Uniform Trade Secrets Act. Other states that have enacted the Uniform Trade Secrets Act have litigated whether bids for prospective work qualify as trade secrets. And, numerous courts have concluded that a confidential bid is a trade secret. USA Power, LLC v. PacifiCorp, 372 P.3d 629 (Utah 2016) is a recent example. In USA Power, a region served by the utility, PacifiCorp, was in need of additional power generation. USA Power was aware of the opportunity to design and construct an additional facility, and it spent two years and nearly $1 million studying, purchasing consultant's advice and formulating how and where to construct such a facility. Id. at 638.
f 78. USA Power disclosed its development plans to PacifiCorp under a confidentiality agreement when PacifiCorp was a potential purchaser of USA Power's development plan for the power generation facility. Id. After USA Power's disclosure, PacifiCorp terminated its negotiations to purchase USA Power's development plan and issued a Request for Proposal (RFP) for development of a power generation facility sufficient to serve the region's need. Id.
¶ 79. USA Power bid in response to the RFP, but PacifiCorp submitted its own competing bid. Pacifi-Corp's proposal was very similar to the bid for devel *530 opment of a power generation facility that USA Power had disclosed to PacifiCorp earlier. Id. When Pacifi-Corp selected its own bid, USA Power sued, claiming its bid was a trade secret created through its years of study, which PacifiCorp misappropriated. Id.
¶ 80. The jury agreed with USA Power. On motions after verdict, the court concluded that because PacifiCorp knew all the components of USA Power's development plan it could anticipate its bid and make that bid a "price to beat." Id. at 654-55. As the court explained, "It can hardly be argued that, in a bidding contest, for one competitor to have access to another competitor's internal financial calculations— calculations that will certainly bear upon that competitor's ultimate bid—would have obvious value. Such financial information is a paradigmatic example of a trade secret." Id. at 655. In upholding the jury's finding that USA Power's bid was a trade secret, the court held "there was sufficient evidence in the record from which the jury could infer that a trade secret existed." Id.
¶ 81. In Ovation Plumbing, Inv. v. Furton, 33 P.3d 1221 (Colo. Ct. App. 2001), a jury found that a plumbing subcontractor's bid was a trade secret. Fur-ton appealed claiming that a bid does not qualify as a trade secret. Id. at 1223. The appellate court relied on the definition of trade secret under the Colorado statute, Colorado's enactment of the Uniform Trade Secrets Act. Id.
f 82. The court began by pointing out that "[w]hat constitutes a trade secret is a question of fact." Id. at 1224. Therefore, it considered whether sufficient evidence had been presented to the jury from which it could have found that the bid was a trade secret. Id.
*531 ¶ 83. There was testimony, "both direct and circumstantial" that the bid had value to Ovation because it was not known by Ovation's competitors. Id. at 1225. Although it was not "clear from the record whether Furton copied Ovation's bid documents or merely used information that he took from the documents!,] ... it [was] clear from the record that Furton did not have permission to access [Ovation's bid documents]." Id. After so concluding, the court affirmed the jury's verdict. Id. at 1225-26.
¶ 84. In CDC Restoration & Const., LC v. Tradesmen Contractors, LLC, 369 P.3d 452 (Utah Ct. App. 2016), a concrete contractor sued Tradesmen, the employer of a former employee, Paul Carsey. It also sued Carsey, and Keith Allen, all for misappropriation of trade secret under Utah's enactment of the Uniform Trade Secrets Act. The suit claimed misappropriation of CDC Restoration's bid for a Kennecott project for repair and restoration work. Id. at 455.
¶ 85. CDC Restoration did business with Kenne-cott under a Preferred Provider Agreement (PPA), a confidential document that set forth CDC Restoration's rates for work, pricing information for hourly employees and hourly rates for use of various types of equipment. Id. Carsey had been a CDC Restoration foreman for a number of years. Id. He regularly delivered confidential information to Kennecott for CDC Restoration, but he never signed a confidentiality agreement. Id.
¶ 86. In mid-2005, Keith Allen, who was then a subcontractor at Kennecott, met with Carsey to discuss forming a company to do work at Kennecott. Later in 2005, while he was employed by CDC Restoration, Carsey and Allen became co-owners of a new company, Tradesmen. Id. At that time, Allen was a subcontractor *532 for Kennecott who supervised CDC Restoration's work there. Id. As part of Allen's work for Kennecott, he had access to CDC Restoration's pricing information for its ongoing projects at Kennecott. Id.
f 87. In late 2005, Kennecott opened a competitive bidding process on a project known as E-Bay. Id. Carsey and another CDC Restoration employee, Ralph Midgley, developed CDC Restoration's bid for E-Bay. Shortly before the bid was submitted to Kennecott, Carsey told Midgley to increase the bid price because more hours of labor were needed than had been calculated initially. Midgley did so. Id.
¶ 88. In the meantime, Carsey and Allen put together a bid on Kennecott's E-Bay project for Tradesmen, which they submitted after CDC Restoration submitted its bid. Id. at 456. Tradesmen underbid CDC Restoration and got the contract. Id.
¶ 89. CDC Restoration sued Tradesmen, Carsey and Allen, alleging "misappropriation of trade secrets for improper use of its labor and equipment rates and bid information." Id. The trial court granted summary judgment for the defendants on all claims. Id. The court of appeals concluded that the record contained "enough evidence to create a genuine issue of material fact to preclude summary judgment regarding CDC's claim for misappropriation of bid information." Id.
f 90. Ajury trial was held, and CDC Restoration prevailed. Id. Again, review was sought. The court of appeals reasoned that misappropriation of trade secrets had two elements: a finding that the bid was a trade secret and a finding that the bid had been misappropriated. Id.
¶ 91. In order to satisfy the first element, the court held that there must have been proof from which the jury could have found: (1) the bid had indepen *533 dent economic value that was "attributable to the independent efforts of the one claiming to have conceived it," and was not readily ascertainable by others, id. at 457-58; and (2) reasonable efforts had been taken to maintain the bid's secrecy. Id. at 458. The court affirmed the jury's finding that the bid was a trade secret, as that term is defined in the Uniform Trade Secrets Act. Id. The court also affirmed the jury's finding that the bid had been misappropriated within the definitions in the Uniform Trade Secrets Act. Id. at 460.
¶ 92. In sum, each of these courts reasoned that whether a confidential bid is a trade secret is a question of fact. However, each court also concluded that sufficient evidence had been presented to prove that the confidential bid at issue was a trade secret under the Uniform Trade Secrets Act.
3. North Highland's claim
¶ 93. In this review of the court of appeals' decision that affirmed the dismissal of North Highland's claim, it is important to remember that we are at the summary judgment stage, not after a trial, because the analyses are very different at those two different stages.
¶ 94. Upon review of summary judgment, we begin by testing the legal sufficiency of the complaint. As we have explained, "Every decision on a motion for summary judgment begins with a review of the complaint to determine whether, on its face, it states a claim for relief." Hoida, Inc. v. M & I Midstate Bank, 2006 WI 69, ¶ 16, 291 Wis. 2d 283, 717 N.W.2d 17 (citing Westphal v. Farmers Ins. Exch., 2003 WI App 170, ¶ 9, 266 Wis. 2d 569, 669 N.W.2d 166). "If it does, *534 we examine the answer to see if issues of fact or law have been joined." Id. Next, we consider "the moving party's affidavits [or other submissions] to determine whether they establish a prima facie case for summary judgment." Id. If a movant's submissions do not establish by undisputed facts that the nonmoving party has no claim or defense, the movant has failed to meet its burden. Leske, 197 Wis. 2d at 96-97.
¶ 95. Therefore, when defendants move for summary judgment dismissing plaintiffs claims, the burden of proof is on the defendants to have proved sufficient undisputed, material facts in the submissions in support of their motion that establish a prima facie showing from which the circuit court is required to conclude that plaintiffs claims must be dismissed. Id. at 97-98.
¶ 96. Although the movant is not required to submit affidavits, the movant must make submissions sufficient to "demonstrate the absence of a genuine issue of material fact." Id. at 97. Stated otherwise, the movant has the burden to demonstrate a basis in the record that shows the plaintiff lacks evidence to support the claim made. Id. at 97-98. It is only after the movant has made a prima facie showing for dismissal of the nonmoving party's claim, that the burden shifts to the nonmoving party to provide submissions opposing the submissions of the movant. Hoida, 291 Wis. 2d 283, ¶ 16.
¶ 97. Leske involved a claim of misappropriation of a " 'program designed to establish a business to manufacture, distribute, and sell ice for commercial use in Dane County and the surrounding area,'" which Leske claimed was a trade secret that defendants misappropriated. Leske, 197 Wis. 2d at 95. Id. at 96. The issue presented on appeal was whether the circuit *535 court properly granted summary judgment dismissing the trade secret misappropriation claim. Id. at 96.[15]
¶ 98. The court of appeals began by examining the complaint. The court concluded the complaint stated a claim for violation of Wis. Stat. § 134.90, Wisconsin's trade secret law, which the answer denied. Id. at 96. The court then examined the submissions by defendants in support of their motion for summary judgment. Id. at 96-97. The court explained that defendants' understanding of their burden as the movants for summary judgment was not correct because defendants asserted that "we should immediately review the plaintiffs material to determine whether he produced evidence in support of his claims." Id. at 97. In reversing the circuit court's grant of summary judgment to defendants, the court explained, "[t]he defendants must demonstrate that the claimed trade secrets do not meet the definition of trade secret." Id. at 98. Although the defendants did make submissions in support of their motion, those submissions were insufficient to make a prima facie showing that plaintiffs claimed trade secret did not meet the definition of a trade secret. Therefore, the court of appeals reversed the circuit court's grant of summary judgment. Id. at 99.
¶ 99. Given the required summary judgment methodology, I begin by examining the complaint.[16] North Highland asserted a claim for trade secret *536 misappropriation.[17] In support of its claim, North Highland asserted that one of Trewyn's duties at North Highland was to formulate North Highland's bid for the Tyson Foods Trolley project.[18] North Highland alleged that Trewyn and Wells "aided and abetted each other" in illegal acts that damaged North Highland.[19] North Highland's bid on the Trolley project was secret.[20] Knowing the amount and/or the terms of North Highland's bid "would allow one to bid slightly below the known bid."[21] The bidding process on the Trolley project was secretive.[22]
¶ 100. North Highland had a confidentiality policy that was expressly set out in its Associate Handbook.[23] Trewyn agreed to comply with the confidentiality policy of the Associate Handbook.[24] Trewyn disclosed North Highland's trade secrets to defendants.[25] That disclosure permitted defendants to bid slightly more favorable terms on the Trolley project and were thereby awarded the project.[26] The defendants had reason to know that Trewyn's disclosing North Highland's bid and their subsequent use of it to North Highland's disadvantage was improper.[27]
1 101. I conclude that the allegations in the complaint are sufficient to state a claim for trade secret misappropriation.
*537 ¶ 102. My review of the answer of Wells and Jefferson Machine shows they denied the allegations in the complaint, generally based on insufficient knowledge to admit or deny.[28] Therefore, the answer is sufficient to join issues of fact and law in regard to North Highland's claim for trade secret misappropriation.
f 103. I next review Wells and Jefferson Machine's submissions in support of . their motion for summary judgment that requested dismissal of North Highland's trade secret misappropriation claim to determine if they established a prima facie defense. Id. at 98. Wells and Jefferson Machine submitted the affidavit of one of their attorneys, Vincent J. Scipior.[29] He attached copies of depositions of Fred Wells and Dwain Trewyn. He also attached North Highland's answers to Wells' and Jefferson Machine's First Set of Interrogatories and Request for Production, Tyson Foods' original specifications and drawings for the trolleys, and page 6 of North Highland's Associate Handbook.
¶ 104. The defendants' brief before us is based on the attachments to the Scipior affidavit. Defendants argue in their brief that North Highland's bid on the Trolley Contract was not a trade secret under Wisconsin law.[30] They assert that a bid is not similar to the types of information listed in Wis. Stat. § 134.90(1)(c). They also argue because the bid was not for continuous or repeated use, it cannot fall within the statutory definition of trade secret. They assert, "One of the fundamental tenets of trade secret law is that information relating to a single event in the conduct of *538 business is not protected," for which proposition they cite Wisconsin Elec. Power Co.[31]
f 105. Wisconsin Elec. Power was issued by the court of appeals in 1981; it interprets Wis. Stat. § 943.205(2) (1975). It was issued before Wisconsin adopted the Uniform Trade Secrets Act, Wis. Stat. § 134.90.
¶ 106. Furthermore, the continuous use requirement relied on in defendants' brief was specifically removed from Wisconsin's trade secret law by Minuteman, a 1989 decision grounded in Wisconsin's enactment of the Uniform Trade Secrets Act. Minuteman, 147 Wis. 2d at 852-53.
f 107. There is no citation to Minuteman in defendants' brief. Furthermore, and much more troubling, there is no citation to Minuteman in the majority opinion even though North Highland clearly makes a claim for misappropriation of trade secret.
¶ 108. Minuteman is our thorough explanation of the changes brought about by Wisconsin's enactment of the Uniform Trade Secrets Act. Instead of citing Minuteman, the defendants cite cases from other jurisdictions, many of which were issued by jurisdictions that had not enacted the Uniform Trade Secrets Act.[32]
¶ 109. Wells also argues that "North Highland has not presented sufficient evidence to support a trade secret misappropriation claim against [hrm.]"[33] Wells asserts that he did not "use" North Highland's bid information, so he could not have misappropriated it.[34] Evidence of misappropriation of trade secret infor *539 mation does not have to be direct evidence. Circumstantial evidence must also be considered in determining whether Wells has established a prima facie defense. See Gagliano & Co. v. Openfirst, 2014 WI 65, ¶ 32, 355 Wis. 2d 258, 850 N.W.2d 845. Here, Wells' own deposition testimony of record defeats his ability to establish a prima facie defense. For example, Wells was actively involved in bidding on the Trolley Contract:
Q This is Exhibit 2. I'm going to show you email 6. That is an email from Gordon Slothower to you and Dwain, right?
A Yes.
Q And the email right on the top, it starts, "Attached is the revised," do you see where I'm pointing to?
A Yes.
Q Why was he giving you a revised trolley drawing?
A I don't know. He copied me on whatever he sent to Dwain. [35]
Wells' involvement in the bidding is further demonstrated; for example, he testified:
Q What did you know about the trolley contract in November of 2011?
A We had an opportunity to quote on it.
Q And you were in conversation with Tyson personnel about that quoting?
A Yes.
*540 Q And in December of 2011 you were also still communicating with Tyson and with Dwain about the trolley contract?
A Dwain was talking with Tyson on the trolley contract.
Q And you were talking with Dwain?
A About the trolley contract?
Q Yes.
A Yes.[36]
Furthermore, Wells knew that the company he and Trewyn owned were making use of North Highland's bid information, but he thought North Highland had no right to object to this. He explained:
Q Did you think that North Highland had any right to have its employees not compete with them at the same time as they were employed at North Highland?
A Say that again.
Q Did you think that North Highland had any right to have its employees not compete against them while they were still employed at North Highland?
A There was no non-compete form with them.
[[Image here]]
Q And the reason why you think they don't have that right is because they didn't have an express non-compete clause in their employment contract?
A Yes.[37]
f 110. When considering the entirety of defendants' submissions, I conclude that they do not provide *541 sufficient undisputed, material facts to preclude the bid from meeting the definition of a trade secret pursuant to Wis. Stat. § 134.90(l)(c) or to preclude the finding that Wells had "reason to know"[38] that he used North Highland's bid without the consent of North Highland after obtaining it through improper means, contrary to § 134.90(2).
¶ 111. My conclusion is required by Wis. Stat. § 134.90(l)(c), which provides:
"Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique or process to which all of the following apply:
1. The information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
2. The information is the subject of efforts to maintain its secrecy that are reasonable under the circumstances.
¶ 112. In order to satisfy Wis. Stat. § 134.90(l)(c)'s criteria and be found to be a trade secret, the bid: (1) must be information that is a compilation; (2) must derive independent economic value from not being generally known by competitors; (3) amount presented to Tyson must not be generally known or readily ascertainable by proper means; (4) must have been subject to reasonable efforts under the circumstances to protect its secrecy.
*542 ¶ 113. It is undisputed, as explained by Wells, that the bid is information assembled as a compilation[39] of "quotes on raw material and the machining time and the assembly time to put the part together."[40] And as Wells further acknowledged, the amount of a bid is not shared with others:
Q The only person you would disclose how much you were bidding was the customer?
A Correct.[41]
The reason for not sharing bid information is self-apparent: if competitors knew the amount of North Highland's bid, that amount becomes the "price to beat." USA Power, 373 P.3d at 654-55. However, whether North Highland took reasonable efforts under the circumstances to protect the bid's secrecy, is a question of fact. Minuteman, 147 Wis. 2d at 849.
¶ 114. The court of appeals assigned the burden of proof to North Highland in response to defendants' motion for summary judgment. North Highland, No. 2015AP643, ¶ 11 ("[W]e agree with Wells that summary judgment is appropriate because North Highland has failed to establish that there is sufficient evidence to support the claim."). While North Highland has the burden of proof at trial, it was error to assign the burden to North Highland on defendants' summary judgment motion when the defendants did not meet their obligation to make a prima facie showing that North Highland's bid did not meet the statutory definition of trade secret or that defendants did not have *543 reason to know they obtained or used North Highland's bid information improperly. Leske, 197 Wis. 2d at 97-99 ("The defendants mistakenly assert that it is Thomas's burden to establish that he took reasonable precautions [to maintain secrecy]. While this would be true at trial, on summary judgment the moving defendants must establish that Thomas did not take reasonable steps.").
¶ 115. The court of appeals also erred when it relied on Wisconsin Elec. Power, which provides an interpretation of Wis. Stat. § 943.205(2) (1976). That statute no longer has any relevance to trade secret law. Minuteman, 147 Wis. 2d at 852-53.[42]
¶ 116. Furthermore, the court of appeals appeared not to recognize that the determination of whether a bid is a trade secret as set out in Wis. Stat. § 134.90(1)(c) is a question of fact. Id. at 849, 854; Ovation, 33 P.3d at 1224; USA Power, 372 P.3d at 655. Similarly, if the jury determines that the bid is a trade secret, it also will be required to determine whether defendants misappropriated it. Minuteman, 147 Wis. 2d at 854-55. Both are factual findings under the Uniform Trade Secrets Act, and as we implied in Minuteman, they are factual findings under § 134.90(1).
C. Claim Preclusion
¶ 117. The court of appeals chose not to address claim preclusion. North Highland, No. 2015AP643, ¶ 11. However, defendants continue to argue that North Highland's claim for misappropriation of trade secret is barred by claim preclusion because of the *544 Stipulation and Order that dismissed Trewyn from this lawsuit. They assert that the circuit court correctly held that claim preclusion bars North Highland's claims.[43]
f 118. "Claim preclusion prevents relitigation of the same claim when: (1) there is an identity of parties or their privies in a prior lawsuit; (2) there is an identity of claims for relief that were brought, or should have been brought; and (3) a final judgment on the merits in a court of competent jurisdiction resolved the first lawsuit." Mrozek v. Intra Financial Corp., 2005 WI 73, ¶ 28, 281 Wis. 2d 448, 699 N.W.2d 54 (citing Kruckenberg v. Harvey, 2005 WI 43, ¶ 21, 279 Wis. 2d 520, 694 N.W.2d 879; Northern States Power Co. v. Bugher, 189 Wis. 2d 541, 551, 525 N.W.2d 723 (1995)).
f 119. Wells and Jefferson Machine create a bootstrap argument under which they assert that North Highland's misappropriation of trade secret claim is precluded. First, they contend that due to its Stipulation with Trewyn, North Highland cannot proceed on its conspiracy claim against them. They cite numerous cases on which I do not comment because I address only the misappropriation of trade secret claim. Then defendants bootstrap North Highland's trade secret claim as a "matter [] arising out of the same facts and occurrences," concluding that all claims against them are precluded.[44] Although the language "arising out of the same facts and occurrences" is claim preclusion language, Wells and Jefferson cannot meet the three necessary elements to support dismissal of all claims under claim preclusion.
*545 f 120. First, neither Wells nor Jefferson Machine was a party to Trewyn's Stipulation, which was entered into during Trewyn's bankruptcy action. To the contrary, the Stipulation provides: "All rights are reserved by North Highland, Inc. to any claims made against joint or several tortfeasors, including Frederick Wells and Jefferson Machine & Tool Inc. North Highland, Inc.'s cause of action remains against all non settling tortfeasors."
¶ 121. Second, the defendants are not privies of Trewyn. As we have explained, "[p]rivity exists when a person is so identified in interest with a party to former litigation that he or she represents precisely the same legal right in respect to the subject matter involved." Pasko v. City of Milwaukee, 2002 WI 33, ¶ 16, 252 Wis. 2d 1, 643 N.W.2d 72. The burden of proving the elements of claim preclusion is on the party asserting dismissal of claims based on claim preclusion. Id.
¶ 122. Although Trewyn was obligated to make certain payments to North Highland under the Stipulation, Wells and Jefferson Machine were not similarly obligated. For example, if Trewyn defaulted on the payments due under the Stipulation, the obligation for payment could not be enforced against Wells or Jefferson Machine. Wells and Jefferson are not privies of Trewyn.
f 123. Here, Trewyn, Wells and Jefferson Machine are alleged to be joint tortfeasors. North Highland sued each of them individually for misappropriation of trade secrets. The Stipulation and release entered with Trewyn is similar to releases that often are used when there is a settlement with one tortfeasor and the lawsuit continues against the remaining tortfeasors.[45]
*546 f 124. Third, there was no final judgment on the merits of the trade secret action against Wells and Jefferson Machine at the time that the circuit court dismissed all claims against them based on claim preclusion. Accordingly, claim preclusion has no application to North Highland's trade secret misappropriation claim against Wells or Jefferson Machine.
III. CONCLUSION
¶ 125. I conclude that defendants, as the moving party to whom summary judgment was granted, failed to make a prima facie showing of sufficient undisputed, material facts that North Highland's bid to construct and supply Tyson with 3,000 trolleys, did not meet the definition of a trade secret as set out in Wis. Stat. § 134.90(1)(c), which Wells and Jefferson Machine misappropriated. Leske, 197 Wis. 2d at 96-97.
¶ 126. Defendants also failed to make a prima facie showing of sufficient undisputed, material facts that Wells, Jefferson Machine and Trewyn did not obtain or use North Highland's Trolley Contract bid information contrary to Wis. Stat. § 134.90(2). Id. Accordingly, I conclude that summary judgment was improperly granted dismissing North Highland's claim for trade secret misappropriation against Wells and Jefferson Machine.
¶ 127. And finally, I conclude that claim preclusion cannot be applied against North Highland based on the Stipulation and Order that dismissed Trewyn from this lawsuit. Therefore, I would reverse the decision of the court of appeals and remand for a jury trial of North Highland's claim against Wells and Jefferson Machine for misappropriation of a trade secret.

 Initially Dwain D. Trewyn, Frederick A. Wells and Jefferson Machine & Tool, Inc. were defendants. On this review, only Wells and Jefferson Machine remain.

 Although I do not address North Highland's breach of fiduciary duty claim, a reversal by this court would abrogate the court of appeals' decision in full. Blum v. 1st Auto & Cas. Ins. Co., 2010 WI 78, ¶ 46, 326 Wis. 2d 729, 786 N.W.2d 78 ("Unless this court explicitly states otherwise, a court of appeals opinion overruled by this court no longer retain[s] any precedential value."). Therefore, all North Highland's claims against Wells would be available for trial upon remand. Id.

 R. at 187:6.

 Affidavit of Vincent J. Scipior, made in Support of Defendants Frederick A. Wells, Bay Plastics Inc., and Jefferson Machine & Tool Inc.'s Motion for Summary Judgment. Vincent Scipior is an attorney for the defendants.

 R. at 76:4.

 R. at 65:6.

 R. at 47:15-16.

 Wells had a sample trolley made at Tyson's request, and he purchased the equipment necessary to perform the Trolley Contract.

 R. at 47:20.

 Jefferson Machine's bid, R. at 65:7.

 R. at 47:11.

 R. at 47:9.

 R. at 47:12.

 R. at 47:19-27.

 This is the same issue, at the same stage of the proceedings, as has been presented by North Highland in the case now before the court.

 I refer to the complaint, even though there is an amended complaint in the record because the two documents do not differ in regard to the allegations relating to North Highland's trade secret claim.

 Complaint, see pp. 6-7.

 Complaint, ¶¶ 7-9.

 Complaint, f 6.

 Complaint, ¶¶ 16, 17.

 Complaint, ¶ 18.

 Complaint, ¶ 19.

 Complaint, f 11.

 Complaint, ¶ 21.

 Complaint, ¶ 20.

 Complaint, ¶ 20.

 Complaint, ¶¶ 22, 23.

 Answer, ¶¶ 1-19. Although Trewyn is no longer a party, his Answer, too, was sufficient to join issues of law and fact.

 R. at 47.

 Resp. Br. 39-45.

 Resp. Br. 42.

 Resp. Br. 43.

 Resp. Br. 45.

 Resp. Br. 45-46.

 R. at 47:19.

 R. at 47:10-11.

 R. at 47:12.

 "Reason to know" is the Wis. Stat. § 134.90(2) standard that Wells' submissions must be sufficient to set aside in regard to misappropriation. As the quotes above show, he has not done so.

 A compilation is an assemblage or gathering. Compilation, Roget's Thesaurus, 51 St. Martin's Press (1965).

 R. at 47:19.

 R. at 47:28.

 Minuteman v. Alexander, 147 Wis. 2d 842, 434 N.W.2d 773 (1989), is not addressed by the court of appeals.

 Resp. Br. 17-26.

 Resp. Br. 23.

 See, e.g., Pierringer v. Hoger, 21 Wis. 2d 182, 124 N.W.2d 106 (1963).